**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

| | |
|---|---|
| **FRANKIE SANTIAGO, NICOLE NERONHA, JOSEPH NERONHA, MARIA NERONHA, and ONNY JULES, on behalf of themselves, and on behalf of all other similarly situated,** | |
| **Plaintiffs,** | **Case No.:** |
| **v.** | **CLASS ACTION** |
| | **DEMAND FOR JURY TRIAL** |
| **D.R. HORTON, INC., and DHI MORTGAGE COMPANY, LTD.** | |
| **Defendants.** | |

## CLASS ACTION COMPLAINT

Plaintiffs Frankie Santiago, Nicole Neronha, Joseph Neronha, Maria Neronha, and Onny Jules (together, "Plaintiffs," or "Mr. Santiago" and the "Neronha Family") individually, and on behalf of all others similarly situated (the "Class" or "Class Members"), file this Class Action Complaint against Defendants D.R. Horton, Inc. ("D.R. Horton"); and DHI Mortgage Company, Ltd. ("DHI Mortgage") (together, "Defendants"), as follows:

## I.    INTRODUCTION

1.    Defendant D.R. Horton, one of the country's largest home builders, operates a deceptive bait-and-switch scheme that conceals the true monthly cost of purchasing its homes from unsuspecting homebuyers. This deception makes D.R.

Horton's homes appear more affordable than competitors' properties, while enabling homebuyers to qualify for loans on homes that cost more than they understand they can afford. To carry out its scheme, D.R. Horton works with its "preferred" mortgage lender, DHI Mortgage, to entice prospective homebuyers—predominantly middle- and working-class Americans—by promising them low, affordable monthly payments. In reality, Defendants create artificially low monthly mortgage payment quotes by deliberately including only a fraction of required property taxes in their payment calculations, while knowingly excluding the remaining taxes. Through this "Monthly Payment Suppression Scheme," D.R. Horton and DHI Mortgage mislead homebuyers into believing their total monthly housing costs will fit within their monthly budget. But Defendants have actual knowledge of the true property tax amounts throughout the entire home sales and financing process, and they know what homebuyers' monthly payments will actually be; however, they prominently and repeatedly center the suppressed monthly payment in all the paperwork provided to homebuyers. It is not until well after closing that homebuyers learn the truth, when their monthly payments increase by hundreds of dollars. By this time, DHI Mortgage has transferred the loan, and a new mortgage servicer delivers the bad news.

2.      Deepening the injury, many of Defendants' customers are participants in the Federal Housing Administration's ("FHA") mortgage program for working- and middle-class Americans and are first-time homebuyers on tight budgets. For these homebuyers, the surprise increase in their monthly payments causes serious hardship. These homebuyers must now scrape together hundreds more dollars every month to

stay current, potentially risking foreclosure. And the overall value of their homes is impacted by the true cost of the property taxes. For these very reasons, the FHA program requires mortgage companies to include the *full* amount of property taxes in the monthly payment—a requirement that Defendants ignore.

3.    Defendants' unfair and deceptive scheme enables them to market their homes as more affordable than competitors' properties through artificially low monthly payment quotes. Typically, a monthly mortgage payment consists of principal, interest, taxes, and insurance. Because homebuyers make purchase decisions based on this total monthly payment amount, Defendants can manipulate the disclosed tax component to make higher-priced homes appear affordable. For example, if a homebuyer had a $2,500 a month budget to cover all four components of a monthly mortgage payment, using a lower tax amount allows Defendants to capture a larger share of that homebuyer's budget for repayment towards the loan principal.

4.    Defendants are able to obscure their misleading property tax estimates from borrowers because of their integrated business model, which allows for the knowing cooperation of the home builder and seller, D.R. Horton, and its "preferred" mortgage lender, DHI Mortgage. By working together, Defendants have devised uniform marketing practices in which their sales agents focus homebuyers on artificially suppressed monthly payments, a tactic that flows through every step of the process, from the initial pitch to closing. Defendants jointly profit from the scheme, through increased home prices and increased fees charged as a percentage of home

price. Consumers lose substantially. They overpaid for their homes and now must pay substantially more out of pocket each month than they were promised.

5.    For example, Defendants promised Plaintiff Frankie Santiago a monthly payment of $2,164.68. Based on this payment, Mr. Santiago chose a D.R. Horton home with a DHI Mortgage loan because the monthly payment was—according to Defendants—lower than other homes with similar sales prices that he was considering. But less than a year after closing, Mr. Santiago's payment skyrocketed by nearly $1,000 per month from $2,164.68 to $3,136.33 when his new servicer conducted an escrow analysis that included *all* of his property taxes as well as the amounts he now had to cover for back taxes due to the scheme.

6.    Similarly, Defendants promised Plaintiffs Nicole Neronha, Joseph Neronha, Maria Neronha, and Onny Jules a monthly payment of $2,602.47. Based on this payment, the Neronha Plaintiffs chose a D.R. Horton home with a DHI Mortgage loan because the monthly payment was—according to Defendants—lower than other homes with similar sales price that they were considering. Initial payments were $2,597.84 per month. But less than two years after closing, Plaintiffs' payment skyrocketed by nearly $1,000 per month to $3,439.07 when their new servicer conducted an escrow analysis that included *all* of their property taxes as well as the amounts they now had to cover for back taxes due to the scheme.

7.    On behalf of those victimized by Defendants' Monthly Payment Suppression Scheme, Plaintiffs bring this class action lawsuit. Plaintiffs seek redress for Class Members, who are all homebuyers who purchased their homes with FHA

mortgages (referred to herein as "FHA Homebuyers" or "Homebuyers"), including but not limited to damages, disgorgement of profits from Defendants for this illegal scheme, and injunctive relief to ensure that Defendants comply with the law and cease preying on unsuspecting buyers seeking their part of the American dream.

## II.    JURISDICTION AND VENUE

8.    This Court has subject-matter jurisdiction over this case under 28 U.S.C. § 1332(d) of the Class Action Fairness Act because the matter in controversy exceeds $5,000,000, exclusive of interest and costs, and it is a class action in which the parties are minimally diverse.

9.    This Court also has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action is brought by Plaintiffs pursuant, inter alia, to the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961.

10.    Minimal diversity exists. The Defendants are incorporated in Texas and Plaintiffs are citizens of Florida.

11.    This Court has personal jurisdiction over Defendants. Defendants conduct substantial business in this District, maintain registered agents in this state, have sufficient contacts with this District, and otherwise avail themselves of the markets in this District.

12.    Venue is proper in this Court under 28 U.S.C. § 1391(b) and (c), specifically, because the actions giving rise to this lawsuit occurred in Orange County, Florida.

### III.  **PARTIES**

13.    Plaintiff Frankie Santiago is a natural person living in Howey in the Hills, Florida. At all times material hereto, Mr. Santiago was a citizen of Florida.

14.    Plaintiff Nicole Neronha is a natural person living in Davenport, Florida. At all times material hereto, Ms. Nicole Neronha was a citizen of Florida.

15.    Plaintiff Joseph Neronha is a natural person living in Davenport, Florida. At all times material hereto, Mr. Neronha was a citizen of Florida.

16.    Plaintiff Maria Neronha is a natural person living in Davenport, Florida. At all times material hereto, Ms. Maria Neronha was a citizen of Florida.

17.    Plaintiff Onny Jules is a natural person living in Davenport, Florida. At all times material hereto, Mr. Jules was a citizen of Florida.

18.    Defendant D.R. Horton, Inc.:

a.  D.R. Horton is the largest homebuilding company in the United States as measured by the volume of home sales closed and revenue. D.R. Horton constructs and sells homes through its operating divisions in 125 markets across 36 states, primarily under the names of D.R. Horton, America's Builder, Emerald Homes, Express Homes, and Freedom Homes;

b.  D.R. Horton's principal place of business is 1341 Horton Circle, Arlington, Texas 76011. For citizenship purposes, D.R. Horton is a citizen of the State of Texas; and

c.  at all times material hereto, D.R. Horton owned and operated as a home builder in Florida, buying, selling, and developing real estate throughout the state, including within this district. D.R. Horton has purposefully availed itself of Florida law and routinely profited from doing business in Orange County and under the laws of the State of Florida. Accordingly, D.R. Horton is subject to specific jurisdiction in this District.

19.    Defendant DHI Mortgage Company, Ltd. (hereinafter "DHI Mortgage"):

a.  DHI Mortgage is a wholly owned subsidiary of D.R. Horton;

b.  DHI Mortgage's principal place of business is 1341 Horton Circle, Arlington Texas 76011. For citizenship purposes, DHI Mortgage is a citizen of the State of Texas;

c.  at all times material hereto, DHI Mortgage served as a mortgage loan originator across the country, serving primarily or exclusively as the mortgage lender for D.R. Horton real estate transactions; and

d.  DHI Mortgage has originated tens of thousands of loans across the state of Florida including within this district. DHI Mortgage has purposefully availed itself of Florida law and routinely profited from doing business in Orange County and under the laws of the State of Florida. Accordingly, DHI Mortgage is subject to specific jurisdiction in this District.

## IV.   GENERAL FACTUAL ALLEGATIONS

### a.   Defendants Market and Sell Homes and Mortgages to Homebuyers.
#### i.   D.R. Horton Sells Newly Constructed Homes to FHA Homebuyers.

20.     Defendant D.R. Horton is the largest homebuilding company in the United States. D.R. Horton's common stock is included in the S&P 500 Index and listed on the New York Stock Exchange ("NYSE") under the ticker symbol "DHI." D.R. Horton's business operations include homebuilding, rental, a majority-owned residential lot development company (Forestar Group Inc.), financial services, and other related activities.

21.     D.R. Horton has established itself as the dominating builder in the starter home market or as D.R. Horton refers to it, the "express" home space.[1] D.R. Horton first rolled out its targeted starter home in 2015 and, since then, this product has become the company's primary driver of profits.[2]

22.     D.R. Horton typically buys large parcels of land to develop as residential neighborhoods, using its in-house team of agents to sell to prospective buyers.

23.     According to its corporate filings, D.R. Horton's "primary focus [is] on the first time and first time move-up homebuyer, which accounts for the majority of [its] home closings." D.R. Horton 2024 Form 10-K. For the year ended September 30, 2024, D.R. Horton's homes had an average closing price of $378,000. *Id.*

---

[1] D.R. Horton, *Home Series*, https://www.drhorton.com/home-series
[2] Builder, *Why D.R. Horton's Express Homes are a Success* (Apr. 29, 2015), https://www.builderonline.com/money/profits/why-d-r-hortons-express-homes-are-a-success_o.

### ii. DHI Mortgage Provides Mortgage Financing, Including FHA Mortgage Loans, to Consumers Buying D.R. Horton Homes.

24.     A substantial majority of consumers buying a D.R. Horton home obtain their mortgage loans from DHI Mortgage. For the year ending September 30, 2024, DHI Mortgage provided mortgage financing services for 78% of the 89,690 homes closed by D.R. Horton's homebuilding operations.  And nearly all DHI Mortgage's business involves originating loans for D.R. Horton properties.

25.     A significant portion of Defendants' mortgage loans are made through the FHA program. For example, in 2024, 42.6% of DHI Mortgage's 70,673 loan originations were through the FHA program.[3]

### 1. Overview of the FHA Program.

26.     Congress created the FHA in 1934 when it passed the National Housing Act. Through the FHA program, the federal government sought to make homeownership accessible to working-class Americans by providing government-backed financing, enabling them to build intergenerational wealth. Congress also created the Government National Mortgage Association ("Ginnie Mae") to allow for the securitization of FHA-insured loans to encourage liquidity in the mortgage market, so that lenders' capital was not tied up for the entire duration of the lengthy mortgage terms. In so doing, lending institutions would be able to issue loans into Ginnie Mae securities so that they can recycle their capital into new loans.

---

[3] See, Origination Data, *DHI Mortgage Company Ltd. Rates, Fees & Info* (Aug. 31, 2015), https://originationdata.com/institution/5493001SXWZ4OFP8Z903#:~:text=Showing%20 1%20to%204%20of,15%20Year%2C%20with%20501%20originations

27.     Today, FHA loans continue to make homeownership more accessible, reduce the risk of foreclosure, make payments more affordable, and reduce the exposure to changing interest rates by extending the terms of mortgage loans to twenty and thirty years.

28.     From 2006 to 2015, the number of FHA-insured loans increased from 3 million to 6.5 million.

29.     Today, FHA loans are home mortgages insured by the government and issued by a bank or other private lender. FHA loans require a lower minimum down payment than many conventional loans, and applicants may have lower credit scores than some mortgage lenders usually require. FHA loans are designed to help low- to moderate-income families attain homeownership, and they are particularly popular with first-time homebuyers.

30.     Mortgage lenders are under no obligation to offer FHA mortgages. However, many lenders to first-time buyers choose to offer FHA mortgages because they are insured against loss and because lower-income and lower-wealth individuals qualify for FHA loans, though they may not qualify for traditional loans.

### 2.     As an FHA Lender, DHI Mortgage Must Adhere to FHA Regulations and Standardized Practices.

31.     A lender's choice to avail itself of the benefit of the federal guarantee, however, comes with an obligation to lend and service FHA mortgages in full compliance with FHA's lending and servicing rules, which are codified as law at 24 C.F.R. Part 203.

32.     As an FHA lender, DHI Mortgage is legally required to comply with the FHA regulations codified at 24 C.F.R. Part 203. Because DHI Mortgage originates tens of thousands of FHA mortgages each year, it is familiar with the regulatory scheme and understands its obligations.

33.     FHA regulations apply to all FHA "mortgagees," broadly defined to include the original lender of any FHA-insured mortgage, as well as successors and assigns. 24 C.F.R. § 203.251(f). Thus, DHI Mortgage and any subsequent servicer are "Mortgagees" of the FHA mortgages that DHI Mortgage originates. As such, when lending to Homebuyers, DHI Mortgage must adhere to U.S. Department of Housing and Urban Development's ("HUD") lending and servicing regulations "with the same force and to the same extent as if a separate contract had been executed relating to the insured mortgage." 24 C.F.R. § 203.257. As an FHA lender, DHI voluntarily assumes a duty to act in compliance with the FHA regulations on each and every FHA qualified loan that it provides.

> 3.  **The FHA Has Adopted Strict Regulations for the Proper Escrow of Property Taxes, Which DHI Mortgage Must Follow When Lending to Homebuyers.**

34.     To protect its interest in the property and guard against default, the FHA requires mortgagees, including DHI Mortgage, to escrow the "estimated amount of all property taxes," as well as insurance and other required payments, and to ensure that these are paid through the regular monthly mortgage payment. 24 C.F.R. § 203.23. FHA regulations also require that the Mortgagee properly estimate and timely collect

these amounts, in accordance with the Real Estate Settlement and Procedures Act ("RESPA"). 24 C.F.R. § 203.550.

35.    The FHA reinforces the express language in the regulation through clear guidance in its FHA Mortgage Handbook. Specifically, FHA Handbook 4000.1 states: "The escrow account must be sufficient to meet the following obligations when they become due: . . . real estate taxes . . . ." FHA Handbook 4000.1 at 375, available at https://www.hud.gov/sites/dfiles/OCHCO/documents/40001-hsgh-update16-5.pdf. The Handbook further explains that "[t]he Mortgagee must use accurate estimates of monthly tax escrows when calculating the total Mortgage Payment. In New Construction cases and Manufactured Homes converting to real estate, property tax estimates must be based on the land and improvements." *Id* at 361-62.

36.    Using a true and reliable estimate of property taxes and other escrowed sums, the originating lender is required to calculate the monthly escrow payment by conducting an  analysis. The lender determines the amount of the taxes, insurance, and  other  escrowed  sums and  the  timing  of  when these amounts must be paid. The lender then conducts a trial analysis for the coming year to determine how much must be paid monthly by the consumer into the escrow account, plus any amount that must be paid at closing as an escrow deposit, to ensure the taxes and other escrowed sums will be paid timely and that the account not only never falls into a negative but also maintains the required cushion amount at all times. All monthly payments for taxes and insurance that are included in the total monthly payment are placed into an escrow account, from which the ultimate loan

servicer disburses funds to pay the property taxes and other escrowed costs when those payments come due—which may be months after the Homebuyer closes on the home. If all the calculations are done correctly, there should be sufficient funds in escrow to pay the property taxes.

37.    If the initial estimate is low, there can be dire consequences for the Homebuyer. When an accurate escrow analysis is eventually completed, the Homebuyer's payment will sky-rocket, causing substantial payment shock—their new monthly payment will not only include the higher monthly payment for the actual taxes, but also the required cushion as a percentage of that higher payment and amounts to cover the shortfall for the past months they have owned the home and paid too little into escrow.

### b.    <u>Defendants Know that The Total Monthly "PITI" Payment is a Key Driver in Homebuyers' Home-Buying Decisions, and to Attract Homebuyers, Engage Their Monthly Payment Suppression Scheme.</u>

38.    When looking to buy a home, the price of the home is a major consideration. But for FHA Homebuyers, the total monthly housing payment is particularly material.

39.    For all FHA mortgages, the monthly mortgage payment consists of four components known as "PITI": loan principal (P); interest on the loan (I), property taxes (T), and homeowner's insurance (I). The principal and interest payments are

applied to the loan itself, and the property taxes and insurance payments are deposited into an escrow account. Accordingly, they are referred to as the escrow payment.[4]

40.    In making homebuying decisions, Homebuyers focus on the monthly payment as a whole to determine if they can afford a home, not the amounts of the individual PITI components. For example, two $300,000 homes in different tax jurisdictions could result in vastly different monthly payments because the property tax component alone can vary dramatically. Similarly, a Homebuyer with a $2,500 monthly budget can afford a more expensive home in a low-tax jurisdiction than in a high-tax area, since the lower property taxes keep the total monthly payment within their budget constraints.[5]

41.    Understanding this dynamic, Defendants seek to maximize the price they receive for their homes while ensuring they appear to offer monthly payments within Homebuyers' budgets.

42.    Because FHA Homebuyers are a large part of both Defendants' customer bases, Defendants understand that monthly payment affordability is these Homebuyers' primary concern. Defendants' marketing strategy emphasizes low monthly payments and affordability to attract Homebuyers. In reality, Defendants systematically work together to obscure the true cost of the home from Homebuyers

---

[4] Escrow payments can also include homeowners' association fees, mortgage insurance, and other amounts.
[5] https://itep.org/housing-affordability-and-property-taxes-how-to-actually-move-the-needle/; https://www.riskwire.com/how-property-taxes-shape-home-values-and-affordability/

by including only a fraction of the required property taxes in the Homebuyers' monthly PITI payment, in violation of FHA requirements.

43.    Defendants execute this scheme through a deliberate bait-and-switch, designed to avoid detection until after purchase. Specifically, in calculating the estimated escrow amount in the initial payment disclosures, DHI Mortgage creates two separate escrow estimates. First, Defendants share a "Suppressed Estimate" with Homebuyers that uses the low property tax assessment for the unimproved land before D.R. Horton built the home. Defendants know that this Suppressed Estimate is not correct for the property after the home is built, but rather, dramatically, and falsely depressed. Second, Defendants create an internal "True Estimate" that reflects the substantially higher property taxes that will actually apply to the completed, improved property. While the "True Estimate" is contained in some misleading documents, Defendants do not use it to calculate the Homebuyer's monthly payment. Instead, Defendants quote the Homebuyer an artificially suppressed monthly payment based on the Suppressed Estimate that is hundreds of dollars lower than what they will ultimately be required to pay each month.

44.    Not only do Defendants use the incorrect Suppressed Estimate when DHI Mortgage makes the initial quotes to the Homebuyers, Defendants continue using that Suppressed Estimate in all paperwork through closing. And DHI Mortgage uses that Suppressed Estimate when setting up the initial escrow account, contrary to FHA requirements and RESPA.

15

45.     Defendants know that the Suppressed Estimate reflects an amount that is consistent with then-current local actual property tax records for the unimproved land. They also know that the taxing authority will reassess the property later (often months later), and at that point, the Homebuyer will be responsible for a monthly property tax payment equivalent or very close to the True Estimate. At some point after the reassessment, the taxes become due at the new substantially higher amount, which the new servicer pays out of the escrow account. But because the escrow account was not calculated based on the True Estimate, when the new taxes are paid, there is a substantial shortfall in the account. Thereafter, the servicer will conduct a new escrow analysis, requiring the Homebuyer to pay not just the higher amount, but also the shortfall, and a new substantially higher cushion. For the Homebuyer, this looks like a sudden, dramatic increase in their regular monthly payment.

46.     Through their Monthly Payment Suppression Scheme, Defendants systemically cut the amount escrowed for property taxes by up to 80% annually. For example, DHI Mortgage might include in the escrow payment taxes of $1,500 per year instead of a good faith and legally required estimate of $7,500 per year that it reasonably anticipates will be charged, based on other homes in the D.R. Horton development and the area generally, as well as its experience in the industry. The end result is that the monthly payment estimate is off by up to $500 per month or $6,000 per year—plus any extra cushion the servicer can collect to ensure the escrow account is not underfunded and any amount necessary to cover any shortfall.

16

47.    The Monthly Payment Suppression Scheme benefits both Defendants by allowing them to close more sales and loans and generate more revenue. Meanwhile, Homebuyers suffer when their payments skyrocket well after they have committed to the home, and they are forced to scrape together enough money to keep their family's home or risk foreclosure.

48.    The mortgage lending and servicing industry is well-aware of the problems that occur, including increased risk of foreclosure, when there has been an escrow shortage. This is why FHA lenders are required to escrow the full amount of the taxes using a true, good-faith estimate and the standard industry practice is to include a "cushion" in the escrow estimates to guard against any surprises.

       **c.** **D.R. Horton and DHI Mortgage Work Together to Carry Out Their Monthly Payment Suppression Scheme.**

49.    Defendants have been successful in carrying out their Monthly Payment Suppression Scheme because of their partnership.

50.    Defendants advertise an appealing and easy "one-stop shop" for home buyers. Defendants know that FHA Homebuyers are typically first-time homebuyers with moderate incomes. Together, Defendants make affordability, and specifically, the monthly payment, a key part of their marketing strategy. And Defendants lean on Homebuyers' inexperience in purchasing homes by designing a one-stop shopping process that funnels Homebuyers through to closing in a way that causes them to never feel the need to seek out any sort of independent experienced lenders and agents who could detect the Scheme.

### i. Defendants Employ an Integrated Marketing Strategy to Attract Prospective Homebuyers by Touting Affordability.

51.    DHI Mortgage and D.R. Horton work together to market their homes and FHA loans to Homebuyers. They have a coordinated advertising strategy designed to promote both services, regardless of which Defendant is doing the advertising. In addition to nationwide advertising, throughout the class period, Defendants created social media pages and accounts for various geographic areas in which they have homes for sale, and together, they created ads that appeal to prospective Homebuyers by promoting their FHA lending services and their ability to meet borrowers' budgets.

52.    For example, D.R. Horton posted the following advertisement on a Facebook page created for the Orlando area to target Homebuyers for buying D.R. Horton homes and DHI Mortgage FHA loans:



53.    In other advertisements, Defendants, and in particular, DHI Mortgage,

appeal to those just entering the home buying process for the first time, by providing

simple explanations and tips about home buying, reflecting an understanding that

prospective Homebuyers may have concerns about affordability. For example, DHI

Mortgage ran promotions on Facebook in January 2025, providing advice to

homebuyers in the form of a multi-step process, including "Step #2 – Know what you can afford" and "Step #3: Create a solid budget."

54.     In addition to online advertising on Facebook, Instagram, and other social media sites, as well as through the MLS listing service and real estate sites such as Zillow, D.R. Horton conducts local advertising to alert consumers of its new Residential Developments and the range of homes for sale. These ads included flyers, signage, and placement in local media.

55.     Often, when D.R. Horton runs advertisements, it includes a link or QR code to direct consumers to its website, where prospective Homebuyers can see more information about the homes for sale in their communities. When prospective Homebuyers visit those pages, they find not only information about the homes, but also advertising for DHI Mortgage, including being directed to a page that touts benefits for Homebuyers, which DHI Mortgage and D.R. Horton jointly publish. There, consumers will see that DHI Mortgage and D.R. Horton are working together, as well as the possible estimated monthly payment associated with the home, as shown below:

56.    From their Texas headquarters, and throughout the class period, Defendants have communicated with one another and with their various representatives in Texas and around the country to design advertisements similar to those described in the preceding paragraphs and to disseminate them over interstate wires to Homebuyers around the country. Each Defendant disseminated the ads with the shared goal of attracting Homebuyers to purchase D.R. Horton homes with funds borrowed from DHI Mortgage and did so while knowing that they would be engaging in the Monthly Payment Suppression Scheme.

57.    Once prospective Homebuyers are interested in a D.R. Horton property, they can contact D.R. Horton through online forms or by phone and wait for D.R. Horton to contact them after completing a form along the lines of the above. From its

Texas headquarters, D.R. Horton oversees a large sales staff based around the country, where it has new residential developments with homes for sale. D.R. Horton trains its sales staff to assist Homebuyers with their questions and help them make appointments to view homes. In so doing, D.R. Horton ensures that even those who have not yet obtained a real estate agent are immediately put on a path to private appointments to view homes and obtain financing from DHI Mortgage.

58.    During the initial interactions with prospective Homebuyers, D.R. Horton directs its sales personnel to focus on affordability and one-stop shopping, touting that D.R. Horton can assist them every step of the way. Upon information and belief, D.R. Horton and DHI Mortgage agreed that D.R. Horton's sales personnel should emphasize how their "preferred" partner, DHI Mortgage, offers deals for Homebuyers through its FHA lending program. When performing intakes with Homebuyers who are currently renting, D.R. Horton sales representatives ask how much they are paying per month for rent.

59.    Once D.R. Horton learns the prospective Homebuyer's target monthly payment, D.R. Horton schedules appointments to show homes, schematics, or model homes in their portfolio for which it knows DHI Mortgage will be able to design a lending package that appears to fit with the Homebuyer's monthly budget.

      **ii.   Once Prospective Homebuyers Are Interested in a Property, Defendants Prepare Misleading Estimates that Suppress the True Monthly Cost.**

60.    When a prospective Homebuyer expresses an interest in moving forward and looking at homes or learning more about DHI Mortgage's options, D.R. Horton

works with DHI Mortgage to design information for the Homebuyer to show how the home will fit into their budget, systemically employing the Monthly Payment Suppression Scheme to make the house seem more affordable than it is.

61.     While many buyers rely on lenders they find through personal referrals or their own real estate agent, Defendants know and intend for their business model to result in Homebuyers contracting with DHI Mortgage without looking for an independent lender. To further this scheme, D.R. Horton and DHI Mortgage work together to present false monthly payment projections, which appear to reflect a good deal, making it so these Homebuyers have little reason to shop around.

62.     In connection with open houses, showings, and appointments, D.R. Horton often presents prospective Homebuyers with more information on financing through DHI Mortgage, and assures them that with DHI Mortgage, the total monthly payment on the house will fit into their budget.

63.     If, for example, the starter express series home in a development sells for $400,000 with a DHI Mortgage estimated monthly payment of $2,600, but the prospective Homebuyer tells D.R. Horton that they can afford $3,000 per month, D.R. Horton will then take the Homebuyer to view an elevated model that would max out the prospective Homebuyer's budget, even if Defendants will need to employ the Monthly Payment Suppression Scheme to do so.

64.     To prepare these false monthly PITI payment projections, DHI Mortgage, with agreement from D.R. Horton, uses the Suppressed Estimate when calculating the monthly payment, even though it has the substantially higher True

Estimate in hand. In so doing, Defendants create a monthly payment estimate that appears to fit in the prospective Homebuyer's budget, while allowing D.R. Horton to capture more of the prospective Homebuyer's budgeted monthly payment in the form of principal, and by extension, charge a higher amount for the home. Defendants transmit these false PITI payment projections to one another and to prospective Homebuyers using interstate wires.

65.    Following Defendants' training and directives, D.R. Horton sales agents around the country communicate these artificially low monthly payments and other home buying information to prospective Homebuyers, sometimes in person and sometimes over the phone or via email.

66.    When the prospective Homebuyer decides to move forward, D.R. Horton's sales agents refer them to DHI Mortgage.

### iii. Defendants' Integrated Business Model Allows Them to Obscure Their Unfair and Deceptive Practices During the Initial Loan Onboarding Process and Through Closing.

67.    After the Homebuyer expresses interest in a home and begins working with DHI Mortgage for a loan, D.R. Horton offers a series of incentives, such as $10,000 towards closing costs, new appliances, window blinds, and even a rate buy-down to entice the buyer to use DHI Mortgage.

68.    DHI Mortgage and D.R. Horton work together, and in most instances, with D.R. Horton's subsidiary title company, to complete the uniform disclosures and other closing documents. Because each of these companies are aware of and

participate in the Monthly Payment Suppression Scheme, the artificially low monthly payment is repeatedly confirmed to the Homebuyer throughout the multi-step loan application and closing process.

69.    **Step 1: Application and Approval**. The Homebuyer, together with DHI Mortgage, completes a loan application, providing detailed financial information. DHI Mortgage exchanges these application documents between its Texas headquarters and local affiliates using interstate wires, typically through DocuSign in California or other third-party e-signature vendors. Shortly thereafter, DHI Mortgage runs credit checks over interstate wires and reviews the application. If lending standards are met, DHI Mortgage pre-approves the Homebuyer for the loan. From its Texas headquarters, DHI Mortgage uses the interstate wires to transmit the approval to D.R. Horton and to the Homebuyer.

70.    **Step 2: Initial Loan Estimate**. DHI Mortgage then prepares and provides the Homebuyer with a "Loan Estimate." Importantly, the Loan Estimate prominently displays the artificially low monthly payment, created using the Suppressed Estimate, which matches the Homebuyer's budget and conforms to the payment discussed with the D.R. Horton sales agent. DHI Mortgage obtained this information from D.R. Horton to prepare the initial Loan Estimate. The Loan Estimate is prepared on a standardized form and is an official document from the lender purporting to reflect a good faith, true estimated cost of the loan and home purchase. An excerpt from an exemplar Loan Estimate appears below:

| Projected Payments | | |
|---|---|---|
| Payment Calculation | | Years 1-30 |
| Principal & Interest | | $1,923.25 |
| Mortgage Insurance | + | 133 |
| Estimated Escrow<br>*Amount can increase over time* | + | 174 |
| Estimated Total<br>Monthly Payment | | $2,230 |

| Estimated Taxes, Insurance & Assessments<br><br>*Amount can increase over time* | $693<br><br>Monthly | This estimate includes<br>☒ Property Taxes<br>☒ Homeowner's Insurance<br>☒ Other: Homeowners Assoc Dues<br>*See Section G on page 2 for escrowed property costs. You must pay for other property costs separately.* | In escrow?<br>SOME<br>YES<br>NO |
|---|---|---|---|

71.     Defendants intend for the prospective Homebuyer to rely on the "Estimated Total Monthly Payment" amount, which they use the Suppressed Estimate to calculate. The Loan Estimate document does not disclose the True Estimate that Defendants know will be the actual property taxes but instead discloses the Suppressed Estimate. While it states that the "Estimated Taxes, Insurance & Assessments" "can increase" over time, Homebuyers understand this statement to refer to normal longer-term increases. In reality, Defendants know at the time the Loan Estimate is provided to the Homebuyer that the property taxes are significantly higher than what is disclosed, as indicated by their statement that only "some" property taxes are included in escrow. This vague statement does not disclose to the Homebuyer that the estimated payment is artificially low. The statement is confusing and is not otherwise discussed or explained by Defendants. Further, while the Loan Estimate states in small print "[y]ou must pay for other property costs separately," Defendants

do *not* disclose what these costs may be nor do they disclose that DHI Mortgage will not escrow sufficient funds to cover actual estimated property taxes, which Defendants knew would be thousands of dollars higher. While Homebuyers might be aware that certain amounts (i.e., homeowners associations dues) would not be included in their escrow account, they have no reason to expect that they would only pay some property taxes as part of their monthly payment and would have to pay a part of the same tax bill to the taxing authority directly.

72.    The Homebuyer signs the Loan Estimate and transmits it back to DHI Mortgage over the interstate wires using the third-party e-signature platform.

73.    **Step 3: Other Initial Loan Paperwork**. After the Homebuyer completes Step 2, DHI Mortgage sends more than a dozen additional documents to review and sign to move forward with the loan and home purchase. These documents fall into three categories, discussed below. These documents are exchanged between DHI Mortgage in Texas and its local affiliates and Homebuyers electronically over interstate wires, often using DocuSign in California or other third-party e-signature vendors.

74.    The first category  of documents to review and sign are consumer-protective disclosures and authorizations, many of which are mandated by state or federal law, such as (i) at least two different mandatory FHA notices; (ii) a notice of business affiliation advising them that D.R. Horton's title company will perform certain work; (iii) an Equal Credit Opportunity Act disclosure; (iv) an authorization to release the Homebuyer's credit score to process the loan; (v) an authorization to release

the Homebuyer's tax return information to process the loan; (vi) an authorization to release the Homebuyer's Social Security Number to process the loan; (vii) an acknowledgement of the appraisal; (viii) a Privacy Act notice; (ix) a Fair Lending Notice; (x) a translation notice; (xi) instructions regarding a waiting period in advance of closing; (xii) a PATRIOT Act disclosure; and (xiii) where applicable, various disclosures required by state law. None of these documents in the first category contain any information that materially alter the terms of the loan or home purchase.

75.    The second category of documents are two documents warning the Homebuyer of their legal obligations. In one, the Homebuyer must warrant the truth of the information they are providing; in another, DHI Mortgage provides them with an occupancy fraud warning. Like the first category of documents, these documents do not contain any information that materially alter the terms of the loan or home purchase.

76.    Hidden in this massive collection of documents to review and sign, DHI Mortgage includes a document entitled "Important Property Tax Notice," or "Tax Notice." This cryptic document is prepared by DHI Mortgage in Texas, with D.R. Horton's knowledge and agreement, and shared over interstate wires with local DHI Mortgage affiliates to transmit to Homebuyers over interstate wires via third-party e-signature platforms, including DocuSign in California. The information contained in the Tax Notice could materially alter the terms of the loan or home purchase and is problematic in at least five ways.

77.    First, the Tax Notice contains confusing language that a Homebuyer would not understand to be relevant to them.  It states "[i]f your Property is assessed as 'unimproved' or 'partially improved' and it is anticipated that the next payment of real property taxes will be based on such unimproved or partially improved assessment, both the analysis of the Escrow Impound Account and the collection of funds for same at closing will be based on estimated or actual 'unimproved' or 'partially improved' taxes." After some additional language regarding the potential for an increase in property taxes and escrow options, it closes by asking the Homebuyer to acknowledge the use of "estimated or actual unimproved or partially improved taxes due to establish the Escrow/Impound Account" and the risk taxes might increase. Homebuyers are not aware of how the property has been assessed by the taxing authority at the time of sale, and the hypothetical writing in the introduction creates the impression that it is not relevant to those Homebuyers purchasing fully constructed homes, as opposed to an undeveloped or partially developed lot.

78.    Second, the Tax Notice is misleading to Homebuyers because DHI Mortgage provides this notice after the Homebuyer has been told the total estimated monthly payment and agreed to proceed with the loan. The purpose of supplemental notices after the Initial Loan Estimate is to provide additional details about the terms to which the Homebuyer based their decision to move forward with the loan and home purchase, not to correct falsities in the Initial Loan Estimate. Thus, Homebuyers would have no reason to believe that later fine print disclosures would contain information that would render the initial estimate materially false.

79.     Third, by providing the Tax Notice to Homebuyers in conjunction with sixteen or more other forms for Homebuyers to review and sign, it is insufficient to put Homebuyers on notice of any deception. Indeed, other than the Tax Notice, every other document Homebuyers sign as part of Step 3 is not one that materially alters the terms of the loan and home purchase. DHI Mortgage intentionally includes this information into the large stack of the other two categories of documents so that Homebuyers understand it as routine paperwork and not something carrying a material surprise.

80.     Fourth, as discussed in paragraph 71 above, Defendants know how to calculate and obtain the True Estimate and could conduct property tax estimates with using the True Estimate at the time the Loan Estimate is provided. There is no legitimate reason to elect to use the Suppressed Estimate. Moreover, the notice does not provide the actual estimate of the true monthly payment, based on the True Estimate, in order to actually inform the Homebuyer of the impact of Defendants' conduct.

81.     Fifth, Defendants are legally obligated by FHA regulations and guidance to create an escrow account that escrows all property taxes and by RESPA to conduct an accurate escrow analysis. These regulations do not provide Defendants the right to obtain a waiver of these obligations, nor does the Tax Notice constitute a knowing and effective waiver, particularly given how misleading it is.

82.     **Step 4: Preparation of the FHA Approval Paperwork**. After DHI Mortgage internally pre-approves the FHA loan, it sets forth preparing the necessary

FHA paperwork. This includes, for each Homebuyer, the HUD form titled "Conditional Commitment Direct Endorsement Statement of Appraised Value." There, DHI Mortgage lists information including the estimated value of the property and monthly expense estimate, for which it uses the True Estimate of the property taxes. DHI Mortgage does not use these accurate figures in the calculating payment in the Loan Estimate and other disclosures that are simultaneously provided to the Homebuyer. These forms do not include a total estimated monthly cost, so when they are provided to the Homebuyer, the Homebuyer does not see any information that would alert them to a material change to their out-of-pocket costs or monthly PITI payment.

83.     **Step 5: Additional Estimates and Pre-Closing Disclosures**. In between loan approval and closing, DHI Mortgage often provides Homebuyers with additional disclosures. These disclosures include revised Loan Estimates, which follow the same form as discussed in paragraphs 70–72. They might contain minor variations as closing costs and other details become finalized. When providing these updated Loan Estimates, DHI Mortgage knows the True Estimate of property taxes, as evidenced by its completion of the Conditional Commitment form. But in each of these disclosures of the Homebuyer's monthly payment, DHI Mortgage continues to use the Suppressed Estimate.

84.     Closer to the loan closing, DHI Mortgage also provides the Homebuyer with a formal Closing Disclosure document, which is on a federal form and appears similar to the Loan Estimate. The Closing Disclosure utilizes the Suppressed Estimate,

despite DHI Mortgage's knowledge of the true property tax amount. The estimated monthly payment appears on the first page in large font and is consistent with or below the monthly payment the Homebuyer initially requested and with the estimates in the Loan Estimate documents.

85.    Obscured on page 4 of the Closing Disclosure, DHI Mortgage lists escrowed and non-escrowed amounts, but nowhere in this document is it clear that the Homebuyer must pay these amounts and do so separately. And at no time does either Defendant explain that the "Estimated Total Monthly Payment" is inaccurate because of this extra amount that would have to be paid.  As an example, page 4 of the Closing Statement says:

**Escrow Account**
*For now,* your loan
☒ will have an escrow account (also called an "impound" or "trust" account) to pay the property costs listed below. Without an escrow account, you would pay them directly, possibly in one or two large payments a year. Your lender may be liable for penalties and interest for failing to make a payment.

| Escrow | | |
|---|---|---|
| Escrowed Property Costs over Year 1 | $2,655.73 | Estimated total amount over year 1 for your escrowed property costs: *See attached page for additional information* |
| Non-Escrowed Property Costs over Year 1 | $6,066.28 | Estimated total amount over year 1 for your non-escrowed property costs: *Property Taxes, HOA Dues*<br><br>You may have other property costs. |
| Initial Escrow Payment | $325.45 | A cushion for the escrow account you pay at closing. See Section G on page 2. |
| Monthly Escrow Payment | $241.43 | The amount included in your total monthly payment. |

☐ will not have an escrow account because ☐ you declined it ☐ your lender does not offer one. You must directly pay your property costs, such as taxes and homeowner's insurance. Contact your lender to ask if your loan can have an escrow account.

| No Escrow | | |
|---|---|---|
| Estimated Property Costs over Year 1 | | Estimated total amount over year 1. You must pay these costs directly, possibly in one or two large payments a year. |
| Escrow Waiver Fee | | |

86.     This document states that there *will* be an escrow account and does not explain what "Non-Escrowed Property Costs" means, nor does it advise a Homebuyer how or where they might pay these costs, even if they understood what this language meant. This document does not explain that the amount listed as "Estimated Total Monthly Payment" was inaccurate and will be significantly higher when correctly calculated.

87.     Upon information and belief, no other mortgage lender in the United States engages in the practice of partially escrowing property taxes by deliberately

33

including only a small portion of a Homebuyer's property taxes in their monthly payment.

88.    The additional Loan Estimates and Closing Disclosures are exchanged between DHI Mortgage in Texas and its local affiliates and Homebuyers electronically over interstate wires, often using DocuSign in California or other third-party e-signature vendors.

89.    **Step 6: Closing**. At least several weeks after approving the loan, DHI Mortgage arranges a real estate closing to finalize the deal. Around this time, using interstate wires, DHI Mortgage creates the loan obligating the Homebuyer. DHI Mortgage also creates an escrow account using the Suppressed Estimate for the upcoming year. And Defendants and D.R. Horton's subsidiary title company prepare the paperwork.

90.    On closing day, the Homebuyer arrives at an office to sign all the prepared documents. Defendants know that Homebuyers arrive at closing expecting that all documents conform to their prior expectations, built from their prior representations regarding the monthly payment for the property. They also know that virtually no borrower walks away from a closing, particularly as doing so will cause them to lose any earnest money or other non-refundable fees paid, as well as jeopardize other terms of the loan and potentially the home itself.

91.    Consistent with Homebuyer expectations, numerous documents presented at closing conform with the Homebuyer's expectations. The Homebuyer is provided with a Closing Disclosure, utilizing the Suppressed Estimate to create a

monthly payment amount that conforms with prior estimates. In addition, at the closing, numerous other standard documents are provided to the Homebuyer to sign, including a document verifying they received the house keys, the mortgage and deed, the promissory note, various riders and addendum, and other disclosures.

92.    Hidden in the stack of documents for the Borrower to sign at closing, DHI Mortgage includes a "First Payment Letter." The top half of this payment letter displays a breakdown of the total monthly payment and a total amount that is consistent with the amount appearing on the Loan Estimates and Closing Disclosures, uses the Suppressed Estimate for taxes, and states when the first payment is due. Beneath that, DHI Mortgage includes for the first time that the estimated taxes owed on the home exceed what is included in the breakdown and recommends that the Homebuyer make additional payments to their escrow account. It also states that the Lender will not accept partial payments.

93.    Defendants know that the First Payment Letter will not cause Homebuyers to walk away from closing. The first half of the Letter, where the monthly payment appears, conforms to Homebuyers' expectations about the monthly payment, built through DHI Mortgage's repeated reinforcement of that amount through Loan Estimates and Closing Disclosures over many weeks. And Homebuyers do not expect that closing will be a bait-and-switch, where the terms of the transaction materially differ from what they have been conditioned to expect—indeed, these disclosures are required by federal law (RESPA and the Truth in Lending Act) precisely to ensure that there are no surprises at closing. Even for those few Homebuyers who read the letter,

the statement that partial payments are not permitted is at odds with the statement that additional funds beyond the monthly payment must be paid.

94.    Further, Homebuyers have every reason to focus and rely on the monthly payment that Defendants have thus far disclosed orally, in the Loan Estimates, and in the Closing Disclosures—which Defendants know. Homebuyers are invested in the dream of home ownership. Some may have given notice to their landlords and not have a place to live. They may have paid non-refundable earnest money or other costs to Defendants, or have incurred other non-refundable costs, like moving expenses. They have spent considerable time and energy getting to this moment when they are about to be handed the keys to their home. Regardless of the reason, Defendants know that this First Payment Letter will not cause anyone to walk away, even if that person would have rejected the deal on the home had Defendants used the True Estimate in the earlier Loan Estimates.

95.    At this point, the Homebuyer completes the paperwork, D.R. Horton transfers the deed to the Homebuyer, and DHI Mortgage places a deed of trust or mortgage on the property preserving DHI Mortgage's interest in the property.

### iv.    Homebuyers Discover the Scheme Months Later When Their Payments Skyrocket.

96.    After the closing, at Defendants' direction, D.R. Horton's subsidiary title company ensures that the funds from DHI Mortgage and the Homebuyer's downpayment is transferred to the proper parties, including paying D.R. Horton the

purchase price of the home with the DHI Mortgage loan proceeds and paying DHI Mortgage for the costs and fees associated with originating the loan.

97.    Shortly after the closing, DHI Mortgage transfers the mortgage to Ginnie Mae and sells the servicing rights to a new servicer. DHI Mortgage no longer owns the loan, its liquidity is restored, and it can proceed to make more mortgage loans and repeat its scheme.

98.    Meanwhile the new servicer begins collecting the Homebuyer's monthly payment. Eventually, the new servicer will have to conduct a new escrow analysis on the loan. Often this happens when property taxes come due, which could be many months after closing. When the servicer sees that the amount in escrow is insufficient to cover the amount due, the servicer will notify the Homebuyer. Under the new analysis, the Homebuyer's monthly payments often skyrocket. The Homebuyer must not only pay more in property taxes going forward, but servicers collect more than what is required to have the required cushion in the escrow account, which is often substantial. In addition, the Homebuyer is required to repay the shortage or deficiency caused by the underpayment of the escrow amount. This new payment—even leaving out the need to cure the deficiency or shortage—far exceeds the payment that the Homebuyer sought and that Defendants promised. Often, the higher payment is more than the Homebuyer can actually afford.

99.    Thus, only after closing and transfer of the loan, when the new servicer conducts an appropriate escrow analysis, do Homebuyers learn that the monthly payment they were promised was a lie, and instead, they owe hundreds more a month

because Defendants had only included a small portion of their actual monthly tax obligation in their monthly payment. These additional amounts put many homeowners at risk of default and foreclosure. In addition, when the correct property tax measurement is taken into account, the home value may have declined or not have appreciated in a way that keeps pace with the market.

100. By artificially depressing the total monthly mortgage payment by manipulating the estimated property taxes, Defendants unlawfully trap homeowners into homes that are more expensive than they can afford, at great loss to homebuyers— and great gain to Defendants.

101. Ultimately, the result of Defendants' Monthly Payment Suppression Scheme is that Plaintiffs and the Homebuyer class do not get what they were promised. They are forced to pay far more per month for the same house after specific misrepresentations were made about the monthly costs of the home purchase and corresponding FHA loans. D.R. Horton has given itself an unfair advantage in the marketplace at the expense of Plaintiffs and the class by presenting its homes as more affordable on a monthly basis than they truly are. In turn, Defendants generate record sales, record profits, and consistently charge greater and greater sums for their properties than they would have commanded on the open market.

## V.    **PLAINTIFFS' ALLEGATIONS**

### a.  **Plaintiff Santiago**

102. Plaintiff, Frankie Santiago ("Mr. Santiago") is thirty-five years old and a claims adjuster for Progressive Insurance. Mr. Santiago and his wife, Carolina

Gonzada de Aguiar Santiago, have three children aged 5, 2, and 1. Mr. Santiago was born in Miami, Florida, where he lived with his family until 2023.

103.    The Santiagos' third child was born with special needs which required Mrs. Santiago to stop working to stay home and care for their child full-time.

104.    Mr. Santiago, like many Americans, struggled with the dramatic increase in rent from 2020 to 2023. By 2023, Mr. Santiago was paying $2,700 per month for a two-bedroom apartment in Miami, Florida. Because of his growing family and the decline in household income, Mr. Santiago was forced leave Miami.

105.    Mr. Santiago first began looking for homes on Zillow, entering his phone number as "interested" in several new build homes and non-new build homes. After Mr. Santiago looked at Zillow, he began receiving advertisements for D.R. Horton homes on social media.

106.    Mr. Santiago found an up-and-coming neighborhood outside of Orlando that had a school that addressed the specific developmental disability needs of his youngest child. The neighborhood was Howey-in-the-Hills, which is located in Lake County, Florida. Mr. Santiago visited Howey-in-the-Hills and felt that he had found a place where he could fulfill his dream of homeownership, good schools, and building a financially stable life for his family.

107.    When Mr. Santiago started looking for homes in Howey-in-the-Hills that could fit his growing family; he quickly found several new-build homes from builders such as Lennar and D.R. Horton, as well as existing homes on the market.

108.   When Mr. Santiago called about seeing a D.R. Horton home that he saw in an online advertisement that was targeted to first time home buyers and starter homes, he spoke with a representative of D.R. Horton, Shantavia Whittleton. Ms. Whittleton is a D.R. Horton home sales specialist in the Orlando area, according to her LinkedIn profile. Ms. Whittleton represented D.R. Horton in its efforts to sell homes located in Howey-in-the-Hills and other areas and was authorized by Defendants to promote DHI Mortgage to prospective buyers like Mr. Santiago.

109.   As a part of the initial call, Ms. Whittleton asked Mr. Santiago basic information about his income, family size, and what he was looking for in a home. Ms. Whittleton asked Mr. Santiago what monthly payment he could afford and specifically asked him how much he paid per month for rent in Miami. Mr. Santiago informed Ms. Whittleton that he could afford a home with a monthly payment between $2,200 to $2,400. Mr. Santiago explained that he was currently paying $2,700 in rent in Miami and that his budget was stretched to the limit. To account for additional costs of home ownership, such as appliance repair, Mr. Santiago preferred a home that was at the lowest end of that range. Mr. Santiago also informed Ms. Whittleton that he was looking for a home that had 3 bedrooms for his family.

110.   On or about December 2023, Ms. Whittleton took Mr. Santiago to see a unit that was nearly complete in the Venezia Community located in Howey-in-the-Hills Florida.

111.   After touring a nearly finished unit located at 1234 Lido Drive, Howey-in-the-Hills, Florida (the "Property"), on behalf of D.R. Horton and DHI Mortgage,

Ms. Whittleton went to work selling Mr. Santiago not only on the unit itself, but on the D.R. Horton sales "process." Ms. Whittleton told Mr. Santiago of the benefits that D.R. Horton's "one-stop-shop" for the home, the financing, and the title work could provide. Ms. Whittleton offered Mr. Santiago incentives and discounts if he agreed to use DHI Title and DHI Mortgage. The incentives included $10,000 of "seller credits" that could be used to cover closing costs, appliances, and window blinds.

112.    Ms. Whittleton advised Mr. Santiago that his estimated total monthly payment would be $2,100 for the D.R. Horton new- build home. Mr. Santiago compared that monthly price to the monthly price of an existing non-new build home and determined that the D.R. Horton home was a good value.

113.    Prior to this purchase, Mr. Santiago had never purchased real estate before. Mr. Santiago was unfamiliar with the process of obtaining financing for purchase of a home.

114.    Mr. Santiago agreed to buy the home built by D.R. Horton, with DHI Mortgage to provide the financing and DHI Title and DHI Title of Florida to provide the title work. To Mr. Santiago, the differences in these entities were not apparent and appeared that all the people and paperwork were from D.R. Horton.

115.    On or about February 15, 2024, Karey Larkins called Mr. Santiago to process his financing. Ms. Larkins is a loan officer for DHI Mortgage. After filling out a loan application, DHI Mortgage and Ms. Larkins informed Mr. Santiago that his best financing option would be an FHA mortgage.

116.    The same day, Defendants and Mr. Santiago undertook Steps 1, 2, and 3 as described in Paragraphs 69–95, whereby each of the documents described therein was provided by DHI Mortgage and its local Florida representatives to Mr. Santiago to sign over the interstate wires, using DocuSign in California to exchange the Loan Estimate, loan application, interest rate lock form, and other initial loan paperwork.

117.    In Step 1, Mr. Santiago filled out a loan application that identified the following key information about Mr. Santiago:

a.    Mr. Santiago currently paid $2,700 per month in rent representing 41.5% of his monthly income;

b.    The loan amount sought was $296,524 and the sale price of the home was $301.995.

118.    As part of Step 2, also on February 15, 2024, DHI Mortgage prepared and provided Mr. Santiago with a Loan Estimate that estimated Mr. Santiago's "Total Monthly Payment" would be $2,230 per month, consistent with the lower end of his budget. In so doing, and unbeknownst to Mr. Santiago, DHI Mortgage used the Suppressed Estimate instead of the True Estimate.

119.    The Loan Estimate states in small print "You must pay for other property costs separately," they do *not* disclose what these costs may be nor do they disclose that DHI Mortgage would not be escrowing enough property taxes to cover the actual estimated property taxes on the home, which Defendants knew would be thousands of dollars more. At the time it prepared the Loan Estimate, and later that day, when transmitting the Tax Notice document described in paragraphs 76–79, DHI Mortgage

42

knew that Mr. Santigo would be assessed much higher property taxes than what was in the Suppressed Estimate, and either knew the True Estimate or knew how to obtain the True Estimate.

120.    After approval, DHI Mortgage initiated Step 4. On or around February 29, 2024, DHI Mortgage completed the HUD form described in Paragraph 82. There it listed the True Estimate of monthly taxes of $438.02. It did not revise its Loan Estimate or otherwise inform Mr. Santiago of the change.

121.    Between loan approval and closing, Defendants undertook Step 5. For example, on March 6, 2024, DHI Mortgage prepared and provided Mr. Santiago a new Loan Estimate, as well as with a Closing Disclosure. Each estimated Mr. Santiago's "Estimated Total Monthly Payment" would be $2,164.68, again utilizing the Suppressed Estimate. DHI Mortgage used DocuSign in California to transmit the documents to Mr. Santiago, who signed these documents and returned them that day via interstate wires.

122.    As the Closing Disclosure also conformed to his expectations about his total monthly payment amount, Mr. Santiago understood that even with some minor variations, his monthly payments would fit comfortably in his budget.

123.    On March 20, 2024, the day before the closing was supposed to take place, Mr. Santiago received a final Closing Disclosure from DHI Mortgage over the interstate wires that again disclosed an "Estimate Total Monthly Payment" identical to the one on March 6, 2024, in the amount of $2,164.68. At no time was Mr. Santiago

informed that this monthly payment was inaccurate or would be higher due to Defendants' failure to escrow the majority of the estimated property taxes.

124.    On March 21, 2024, Mr. Santiago attended the closing, and completed the documents described in Step 6, Paragraphs 89–95.

125.    At no point during the sales pitch from Ms. Whittleton nor the financing discussions with Ms. Larkins, nor in any other communication, did any D.R. Horton or DHI Mortgage representative mention that Mr. Santiago would owe substantial additional property taxes beyond those property taxes included in his monthly PITI payment nor that his payment would be more than $400 more per month than the amount that was listed as his "Estimated Total Monthly Payment."

126.    Within sixty days of closing, Mr. Santiago's loan was sold by DHI Mortgage and servicing was transferred to LoanCare. DHI Mortgage received proceeds from that sale via the interstate wires.

127.    From May 1, 2024, through December 1, 2024, Mr. Santiago paid $2,164.68 per month as stated on each bill he received from LoanCare.

128.    On December 12, 2024, Mr. Santiago received notice from LoanCare that his monthly mortgage payment had increased by nearly $1,000 per month to $3,136.33. Mr. Santiago's escrow account had a negative balance of $4,417.43, less than one year after closing on his home. The deficiency was the result of a $5,719.38 property tax bill that LoanCare paid on Mr. Santiago's behalf on November 26, 2024.

129.    DHI Mortgage used the Suppressed Estimate of $613.08 in property taxes per year to calculate Mr. Santiago's monthly payment, meaning that Mr. Santiago's

escrow payment should have been nine times the amount that it was escrowed by DHI Mortgage to avoid a deficiency. DHI Mortgage knew that this was the case, but it chose to artificially suppress the payment by failing to include the full amount of the taxes it knew would be due.

130.  At the time Mr. Santiago compared a D.R. Horton home and the monthly payment to the payment on an existing home that was similarly priced, the D.R. Horton home appeared to be several hundred dollars cheaper per month. That difference influenced his purchasing decision. In reality, the D.R. Horton home was not less expensive than the other homes that Mr. Santiago was considering, it just appeared that way due to Defendants' Monthly Payment Suppression Scheme.

131.  Defendants intended to mislead Mr. Santiago. The Loan Estimates and Closing Disclosures provided to Mr. Santiago were prepared using forms created by the federal government and transmitted at various points in advance of closing in accordance with federal law to ensure home buyers have accurate and truthful information about the mortgage loan. D.R. Horton and DHI Mortgage knew that a budget-sensitive Homebuyer like Mr. Santiago would focus on the monthly payment amount, and by repeating that the suppressed monthly amount many times, in contravention of both law and mortgage lending best practices, Defendants did not use those forms to disclose the truth. Instead, Defendants created other paperwork that reinforced the intentional nature of the Monthly Payment Suppression Scheme.

132.    Mr. Santiago will not be able to continue making monthly payments that are 31% higher than the payment that that Defendants presented to him and that he agreed to pay.

133.    Mr. Santiago was injured by Defendants' Monthly Payment Suppression Scheme. He agreed to purchase a home with a Monthly Payment equal to $2,164.68, with minor and reasonable fluctuations as the home value and local tax rates changed. But at all times, Defendants knew the cost of the home would be substantially more, independent of changes to the home value and local taxes. Had Defendants had taken timely and proper steps to provide him with a monthly payment estimate utilizing the True Estimate of property taxes in accordance with the duties and obligations of a FHA mortgage lender and set up the account to escrow all taxes, Mr. Santiago would not have moved forward with the purchase, or at a minimum, would have paid less for the house.

134.    As a result, Mr. Santiago has suffered damages including but not limited to purchasing a home that he would not have purchased but for the fraudulent scheme, paying an inflated price for his home, diminished home value, lost opportunity to purchase alternative homes within his budget, increased out of pocket monthly expenses in the form of a higher PITI, and other consequences, such as an increased risk of foreclosure and late fees.

### b.  The Neronha Plaintiffs

135.    Plaintiffs Nicole Neronha, Joseph Neronha, Maria Neronha, and Onny Jules (collectively, the "Neronha Plaintiffs") form a multi-generational household.

Nicole Neronha is married to Onny Jules. Joesph Neronha and Maria Neronha are Nicole's parents and live with the couple, along with Nicole Neronha's and Mr. Jules' three children.

136.    Both Nicole Neronha and Mr. Jules work at a local resort. Nicole Neronha works at a retail shop located in the resort. Mr. Jules works as a security guard at the resort.

137.    Like many Americans, Nicole Neronha and Mr. Jules struggled with high rent, a growing family, and difficulty securing financing approval to buy a home. Maria Neronha and Mr. Jules attempted to qualify to buy a home on their own, but they did not earn enough to buy a home anywhere in the greater Orlando area. Nicole Neronha and Mr. Jules turned to the idea of buying a home with Maria Neronha and Mr. Neronha, hoping that together they might qualify to buy a home that the family of seven could live in together.

138.    Maria Neronha and Mr. Neronha are retired. Mr. Neronha worked as a pastor for many years in Rhode Island before he and his wife moved to Florida to be closer to Nicole Noronha, Mr. Jules, and their grandchildren. Together the Neronha family agreed that buying a home together was their best chance at finding financial security.

139.    On or about July 22, 2022, the Neronha Plaintiffs applied for financing with the Bank of England. With the combined income of the entire Neronha Plaintiffs, they received approval for an FHA 30-year loan up to $392,755. Bank of England estimated that the total monthly payment on a loan in this amount would be $2,910.13.

140.    With their approval in hand, the Neronha Plaintiffs began searching for a home. They hired real estate agent Savannah Wyker and informed Ms. Wyker that they could afford a monthly payment of $2,600 per month. They viewed two homes but learned that the monthly payments on both would exceed $3,000 and were out of their budget.

141.    The Neronha Plaintiffs visited a D.R. Horton model unit located near 1239 Berry Lane, Davenport, Florida 33837. The Neronha Plaintiffs first met with D.R. Horton sales representative, Heather Crider. As part of the initial meeting on or about August 1, 2022, Ms. Crider asked the Neronha Plaintiffs what they could afford to pay per month. The Neronha Plaintiffs stated that they were looking to spend approximately $2,600 per month.

142.    After Ms. Crider ran the numbers on the D.R. Horton new-build home compared to an existing non-new build homes on the market, the Neronha Plaintiffs learned that the brand-new D.R. Horton home was significantly cheaper on a monthly basis than an existing home. A brand-new home for a cheaper monthly payment seemed like a fantastic deal.

143.    Prior to this purchase, Nicole Neronha and Mr. Jules had never purchased real estate before. Mr. Neronha and Maria Neronha had purchased and sold one home in another state over 15 years prior to this transaction. The Neronha Plaintiffs were unfamiliar with the process of obtaining financing for purchase of a home.

144.    Ms. Crider informed the Neronha Plaintiffs that the transaction would be much easier if the Neronha Plaintiffs agreed to use DHI Mortgage to finance the transaction and DHI Title to conduct the title work and prepare the closing documents. In addition, Ms. Crider offered the Neronha Plaintiffs $6,500 towards closing costs if they used DHI Mortgage.

145.    Trusting that D.R. Horton had their best interests in mind, the Neronha Plaintiffs agreed to buy the home, located at 1239 Berry Lane, Davenport, Florida 33837, even though it was still under construction by D.R. Horton, with DHI Mortgage to provide the financing and DHI Title and DHI Title of Florida to provide the title work. To the Neronha Plaintiffs, all these various entities were simply D.R. Horton.

146.    Shortly after the meeting, the Neronha Plaintiffs spoke with Thomas Soehn, a DHI Mortgage closing agent, and they filled out a loan application.

147.    The same day, Defendants and the Neronha Plaintiffs undertook Steps 1, 2, and 3 as described in Paragraphs 69–81, whereby each of the documents described therein was provided by DHI Mortgage and its local Florida representatives to the Neronha Plaintiffs to sign over the interstate wires, using DocuSign in California to exchange the Loan Estimate, loan application, interest rate lock form, and other initial loan paperwork.

148.    In Step 1, the Neronha Plaintiffs filled out a loan application.

149.    As part of Step 2, DHI Mortgage prepared and provided the Neronha Plaintiffs with a Loan Estimate that estimated their "Total Monthly Payment" would

be around $2,600 per month, consistent with their budget. In so doing, and unbeknownst to the Neronha Plaintiffs, DHI Mortgage used the Suppressed Estimate instead of the True Estimate.

150.    The Loan Estimate states in small print "You must pay for other property costs separately," they do ***not*** disclose what these costs may be nor do they disclose that DHI Mortgage would not be escrowing enough property taxes to cover the actual estimated property taxes on the home, which Defendants knew would be thousands of dollars more. At the time it prepared the Loan Estimate, and later that day, when transmitting the Tax Notice document described in paragraph 76–81, DHI Mortgage knew that the Neronha Plaintiffs would be assessed much higher property taxes than what was in the Suppressed Estimate, and either knew the True Estimate or knew how to obtain the True Estimate.

151.    After approval, DHI Mortgage initiated Step 4. DHI Mortgage completed the HUD form described in Paragraph 82. It did not revise its Loan Estimate or otherwise inform the Neronha Plaintiffs of the change.

152.    Between loan approval and closing, Defendants undertook Step 5. For example, DHI Mortgage prepared and provided the Neronha Plaintiffs with at least one Closing Disclosure. Each estimated Neronha Plaintiffs "Estimated Total Monthly Payment" would be approximately $2,600. DHI Mortgage used DocuSign in California to transmit the documents to each Neronha Plaintiff, who signed these documents and returned them that day via interstate wires.

153.    As the Closing Disclosure also conformed to their expectations about their total monthly payment amount, the Neronha Plaintiffs understood that even with some minor variations, the monthly payments would fit comfortably in their budget.

154.    Although the Neronha Plaintiffs signed the contract for sale of the property located at 1239 Berry Lane, Davenport, Florida 33837 for $389,990 in August 2022, construction was delayed for several months and the closing did not take place until January 31, 2023.

155.    In the weeks leading up to January 31, 2023, the Neronha Plaintiffs received a final Closing Disclosure from DHI Mortgage over the interstate wires that again disclosed an "Estimate Total Monthly Payment" identical to the one on January 31, 2023, in that amount of $2,602.47. At no time were the Neronha Plaintiffs informed that this monthly payment was inaccurate or would be higher due to Defendants' failure to escrow the majority of the estimated property taxes.

156.    On January 31, 2023, the Neronha Plaintiffs attended the closing, and completed the documents described in Step 6, Paragraphs 89–95.

157.    At no point during the sales pitch from Ms. Crider nor the financing discussions with Mr. Soehn, nor in any other communication, did any D.R. Horton or DHI Mortgage representative mention that the Neronha Plaintiffs would owe additional property taxes beyond those property taxes included in the monthly PITI payment, nor that their payment would be $326.94 higher per month than the amount that was listed as in their "Estimated Total Monthly Payment" stated in the Loan Estimate and Closing Disclosures.

51

158.    Within sixty (60) days of closing, the Neronha Plaintiffs' loan was sold by DHI Mortgage and their new loan servicer was Carrington Mortgage Services, LLC ("Carrington"). DHI Mortgage received proceeds from that sale via the interstate wires.

159.    From February 1, 2023, through November 1, 2024, the Neronha Plaintiffs paid $2,597.84 per month, as stated on each bill they received from Carrington and approximately the amount that had been listed in each Loan Estimate and Closing Disclosure.

160.    On November 29, 2024, the Neronha Plaintiffs received a notice from Carrington in the mail that their monthly mortgage payment was going to increase by $841.23 per month and that their escrow account had a negative balance of $5,597.12. The deficiency was the result of a $7,255.43 property tax bill that Carrington paid on the Neronha Plaintiffs' behalf on November 14, 2024. The new monthly mortgage payment of $3,439.07 represented a 32% increase.

161.    DHI Mortgage used the Suppressed Estimate of property taxes to calculate the Neronha Plaintiffs' monthly payment, meaning that the escrow payment should have been seven times the amount that was escrowed by DHI Mortgage to avoid a deficiency. DHI Mortgage knew that this was the case but chose to artificially suppress the payment by failing to include the full amount of the taxes it knew would be due.

162.    At the time the Neronha Plaintiffs compared a D.R. Horton home and the monthly payment to the payment on an existing home, the D.R. Horton home

appeared to be several hundred dollars cheaper per month. That difference influenced their purchasing decision. In reality, it was not less expensive than the other homes that the Neronha Plaintiffs were considering, it just appeared that way due to Defendants' Monthly Payment Suppression Scheme.

163.    Defendants intended to mislead the Neronha Plaintiffs. The Closing Statements and Loan Estimates provided to them were prepared using forms created by the federal government and transmitted at various points in advance of closing in accordance with federal law to ensure home buyers have accurate and truthful information about the mortgage loan. D.R. Horton and DHI Mortgage knew that budget-sensitive Homebuyers like the Neronha Plaintiffs would focus on the monthly payment amount, and by repeating that amount many times, in contravention of both law and mortgage lending best practices, Defendants did not use those forms to disclose the truth. Instead, Defendants created other paperwork that reinforced the intentional nature of the Monthly Payment Suppression Scheme.

164.    The Neronha Plaintiffs will not be able to afford a payment that is 32% higher than the payment Defendants presented to them and that they agreed to pay. The Neronha Plaintiffs were injured by Defendants' Monthly Payment Suppression Scheme. They agreed to purchase a home with a Monthly Payment equal to $2,602.47, with minor and reasonable fluctuations as the home value and local tax rates changed. But at all times, Defendants knew the cost of the home would be substantially more, independent of changes to the home value and local taxes. Had Defendants taken timely and proper steps to provide them with a monthly payment estimate utilizing

the True Estimate of property taxes in accordance with the duties and obligations of a FHA mortgage lender and set up the account to escrow all taxes, the Neronha Plaintiffs would not have moved forward with the purchase, or at a minimum, paid less for the house.

165.    As a result, the Neronha Plaintiffs have suffered damages including but not limited to purchasing a home that they would not have purchased but for the fraudulent scheme, paying an inflated price for their home, diminished home value, lost opportunity to purchase alternative homes within their budgets, increased out of pocket monthly expenses in the form of a higher PITI, and other consequences, such as an increased risk of foreclosure and late fees.

## CLASS ACTION ALLEGATIONS

166.    Plaintiffs bring this case on behalf of themselves and all other persons similarly situated, pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3). The proposed Class (the "Class") is defined as follows:

> **All individuals in the United States who, during the Class Period, (1) purchased a D.R. Horton home; (2) with an FHA-insured loan originated by DHI Mortgage; and (3) for which for which the property taxes set forth on the HUD Conditional Commitment Direct Endorsement Statement of Appraised Value form is higher than the amount of taxes included in the initial escrow analysis as reflected on the final Closing Disclosure, within the applicable statute of limitations.**

167.    Plaintiffs bring this case on behalf of themselves and all other persons similarly situated, pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3). The proposed "Florida Sub-class" is defined as follows:

**All members of the Class defined above who purchased a home located within the State of Florida.**

168.    Expressly excluded from the Class are:

    a.    any Judge or Magistrate Judge presiding over this action and members of their immediate families;

    b.    defendants and any entities in which Defendants have a controlling interest, or which has a controlling interest in Defendants and its legal representatives, assigns and successors; and

    c.    all persons who properly execute and file a timely request for exclusion from the Class.

169.    Plaintiffs reserve the right to amend the Class definition at the Class Certification stage of the litigation if further investigation and discovery indicates that the Class definition should be narrowed, expanded, or otherwise modified.

## Fed. R. Civ. P. 23(a) Criteria

170.    **Numerosity**. The exact number of Class Members is unknown as such information is in the exclusive control of Defendants. However, due to the number of closings that Defendants conduct annually, the nation-wide class is believed to be in the high tens of thousands, possibly greater than 100,000. Due to the number of closings Defendants conduct annually in Florida, the number of Florida Sub-class members is expected to be in the tens of thousands. Thus, the Class is so numerous that joinder of all members is impracticable.

171. **Commonality**. Common questions of law and fact affect the rights of each Class Member, and common relief by way of damages is sought for Plaintiffs and Class Members. Common questions of law and fact that affect Plaintiffs and the Class include, but are not limited to:

a.  whether Defendants formed a RICO enterprise and conspiracy;

b.  whether Defendants' alleged use of the mail and interstate wires to (i) disseminate advertisements over social media and the internet generally targeting FHA Homebuyers; (ii) transmit and exchange information and documents relating to the homebuying process, such as estimates, quotes, Homebuyer information, loan documents, and other forms, between one another, and with Homebuyers, often utilizing third-party e-signature platforms; (iii) transmit and exchange funds associated with the homebuying process and subsequent sale and transfer of the loans between one another and any third parties who later acquire the loans, in furtherance of the their Monthly Payment Suppression Scheme and systematic bait-and-switch scheme to deceive Homebuyers about the true cost of homeownership constitutes a pattern of wire fraud under RICO;

c.  whether Defendants' Monthly Payment Suppression Scheme misled the class into purchasing their homes;

d. whether Defendants' Monthly Payment Suppression Scheme constitutes a per se violation of Florida's Unfair and Deceptive Trades Practices Act ("FDUTPA"), Fla. Stat. § 501.201, *et seq.;*

e. whether Defendants Monthly Payment Suppression Scheme is unfair and/or deceptive in violation of the Florida's Unfair and Deceptive Trades Practices Act ("FDUTPA"), Fla. Stat. § 501.201, *et seq.*;

f. whether Defendants' Monthly Payment Suppression Scheme constitutes a per se violation of FDUTPA;

g. whether Defendants' conduct was negligent;

h. whether Defendants were unjustly enriched by the Monthly Payment Suppression Scheme;

i. whether Defendants' conduct damaged Plaintiffs and class members, including, but not limited to, by causing them to pay an inflated price for their home, experience diminished home value, lose opportunities to purchase alternative homes within their budgets, suffer increased out of pocket monthly expenses in the form of a higher PITI, and face other consequences, such as an increased risk of foreclosure and late fees, and otherwise depriving them of the benefit of the bargain; and

j. whether Plaintiffs and Class Members are entitled to treble damages, equitable relief, civil penalties, punitive damages, injunctive and/or declaratory relief.

172.    In the alternative, Plaintiffs seek certification under Rule 23(c)(4) with respect to one or more of the above issues or such other issues as may be identified in the future.

173.    **Typicality**. The claims and defenses of Plaintiffs are typical of the claims and defenses of the Classes because Plaintiffs were subjected to the same uniform sales practices, documents, and conduct as that of the Class.

174.    **Adequacy of Representation**. Plaintiffs will fairly and adequately assert and protect the interests of the Class. First, Plaintiffs have hired attorneys who are experienced in prosecuting class action claims within the State of Florida and across the United States, and who will adequately represent the interests of the Class. Second, Plaintiffs have no conflict of interest that will interfere with the maintenance of this class action as their claims are the same as the Class Members they seek to represent. Further, Plaintiffs understand their obligations to the Class, are committed to vigorously litigating this matter, and will fairly and adequately protect and represent the interests of the Class.

### Rule 23 (b)(3) Criteria

175.    The common questions of law and fact set forth herein predominate over any questions affecting only individual Class Members. A class action provides a fair and efficient method for the adjudication of this controversy for these reasons and is superior to the alternative methods involved in individual litigation.

176.    Although the Class is numerous enough to meet the numerosity requirement, the proposed Class does not create manageability problems because the

claims turn on common legal determinations. Either Defendants violated RICO, were unjustly enriched, violated FDUTPA, and/or were negligent, or they did not. Either the home values were inflated or they were not. There are no unusual legal or factual issues that would create manageability problems as the issues turn on a single interpretation of Defendants' uniform conduct regarding their home sales and origination of FHA mortgages in relation to Plaintiffs and others in similar instances.

177.    Prosecution of separate actions by individual members of the Class would create a risk of inconsistent and varying adjudications against Defendants when confronted with incompatible standards of conduct.

178.    Despite the sizeable sum of money unlawfully collected and retained by the Defendants, the claims of the individual Class Members are, nevertheless, small in relation to the expenses of individual litigation, making a class action the only procedural method of redress in which Class Members can, as a practical matter, and recover their damages. Further, the issues raised in this litigation are complex such that an individual's recovery is small in relation to the amount of effort, cost, and expertise necessary to obtain said recovery.

179.    Class Members are readily identifiable and ascertainable given the nature of Defendants' business practices and using their business records.

## CAUSES OF ACTION

### COUNT I
**Conduct and Participation in a RICO Enterprise Through a
Pattern of Racketeering Activity
(RICO 18 U.S.C. § 1962 (c) ("RICO")**

**(On Behalf of Plaintiffs and the Classes against All Defendants)**

180.    Plaintiffs repeat and reallege paragraphs 1 through 179 as if set forth fully herein.

181.    Section 1962(c) makes it:

[U]nlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity ...

18 U.S.C. § 1962(c).

## The Enterprise

182.    The Enterprise within the meaning of 18 U.S.C. § 1961(4) consists of an association-in-fact of, at a minimum, D.R. Horton and its wholly-owned subsidiary DHI Mortgage (the "Enterprise").

183.    Each Defendant is an entity within the meaning of "person" as defined in 18 U.S.C. § 1961(3) because each is capable of holding, and does hold, "a legal or beneficial interest in property."

184.    Each Defendant is legally distinct from the other, in that each is separately incorporated, and each operates different businesses. D.R. Horton's business is to build and sell homes, and it does so with or without financing from DHI Mortgage and with or without FHA mortgages. DHI Mortgage operates as a separate lending institution with its own mortgage origination business. DHI Mortgage's business is to make home-secured loans, both FHA-backed and conventional, and it

does so for homes sold by D.R. Horton as well as other individual and corporate home-sellers and refinancing existing loans on owner-occupied homes.

185.    Each Defendant has distinct regulatory and legal obligations, licensing requirements, and insurance considerations. In executing the Monthly Payment Suppression Scheme, each Defendant performs different roles in the Enterprise, relying on a web of contractual and business relationships designed to execute the Monthly Payment Suppression Scheme.

186.    **Connection to Interstate Commerce:** The Enterprise is engaged in activities that affect interstate and foreign commerce. Defendants each participate in and operate the Enterprise from their respective headquarters in Texas and through their agents and representatives around the country. They conduct home sales and mortgage originations across multiple states and, as discussed below, rely on the interstate wires to further their goals.

187.    **Relationship:** Each member of the Enterprise has a relationship to each other. D.R. Horton is the parent corporation of DHI Mortgage. They have agreed with one another to execute the Monthly Payment Suppression Scheme.

188.    **Common Purpose:** Each member of the Enterprise associated together for the common purpose of selling homes to FHA Homebuyers at higher prices than these buyers would otherwise be willing to pay.  Each member of the Enterprise has an interest in furthering the common purpose. D.R. Horton obtains more money for the sale of each home, and DHI Mortgage can command a higher price for the loan that it sells after origination. And because of the Monthly Payment Suppression

Scheme, Defendants each increased their total number of closings by making the deal look better than it actually is, enticing Homebuyers to buy homes they would not otherwise buy. Each Defendant benefited financially from its scheme to defraud the Class, receiving monies which they would not have received but for the existence of the scheme.

189. **Longevity:** Beginning before the Class Period and continuing to this day, Defendants have engaged in the Monthly Payment Suppression Scheme as to thousands of Homebuyers. The names, locations, and dates of each Homebuyer's injuries are in the exclusive control of Defendants. Defendants, through the Enterprise, continue to expand and operate pursuant to agreements entered into between and amongst Defendants and other unnamed co-conspirators. The RICO Enterprise has functioned as a continuing unit.

## Each Defendant Conducts and/or Participates in the Affairs of the Enterprise

190. Defendants each had the specific intent to participate in the overall RICO Enterprise and the scheme to defraud Plaintiff and the Class, and each participated and controlled in the enterprise as follows:

191. Defendant D.R. Horton directs, controls, and participates in the activities of the Enterprise in a variety of ways as set forth herein, including:

    a. building the home, and listing the home for sale;

b. running advertisements nationwide and locally, using the interstate wires, that promote both D.R. Horton and DHI Mortgage, including its FHA mortgage lending business;

c. employing and training the sales representatives that:

    i. communicate with potential buyers including Plaintiffs and Class Members;

    ii. promote to Class Members its relationship with DHI Mortgage, the benefit of one-stop shopping when purchasing a home, and both Defendants' ability to work within a budget;

    iii. solicit the monthly payment or PITI that the buyer can afford;

    iv. showing homes to Class Members that it knows it will price at an amount that exceeds their budget; and

    v. offer the buyers incentives to use DHI Mortgage for their financing.

d. determining the inflated price on the home, with the knowledge that DHI Mortgage will structure an estimated monthly payment with suppressed amount of property taxes, to make the home appear more affordable to the Class Member;

e. facilitating the Class Member's relationship with DHI Mortgage, all while knowing that DHI Mortgage will structure an estimated monthly payment with a suppressed amount of property taxes, enabling it to charge a higher amount for the home, by:

      i.   directing the Class Member to a specific DHI mortgage sales professional for financing, and

     ii.   communicating with DHI Mortgage regarding Homebuyers' budgets and pricing on its homes.

    f.   coordinating with DHI Mortgage on the determining the Suppressed and True Estimates for property taxes on the homes;

    g.   undertaking efforts to finalize the paperwork associated with the sale and closing; and

    h.   receiving the proceeds of the sale of the home at an inflated price via interstate wires.

192. Defendant DHI Mortgage directs, controls, and participates in the activities of the enterprise in a variety of ways as set forth herein, including but not limited to engaging in the following:

    a.   authorizing D.R. Horton to run advertisements on its behalf and promote the benefit of one stop shopping to Class Members;

    b.   communicating with Class Members about DHI Mortgage's FHA lending options;

    c.   communicating with D.R. Horton regarding the price at which the home should be sold, the Class Members' budgets, and the Suppressed and True Estimates of associated property taxes to design a lending package that uses a higher home price to capture an outsized share of

the Class Member's monthly payment in the form of principal and interest;

d.  obtaining and review loan applications, including the expected monthly payment of the buyer;

e.  completing the escrow calculation in coordination with D.R. Horton;

f.  drafting, completing, transmitting each of the documents identified in Paragraphs 69–95, including the Loan Estimates and Closing Disclosures, and collecting signatures from Class Members, utilizing suppressed monthly payment amounts;

g.  undertaking efforts to finalize the paperwork associated with the sale and closing; and

h.  receiving profits from the closing of Plaintiffs' and the Class Members' loan through inflated fees and through the sales of servicing rights for the loans through interstate wires.

### Defendants Committed Multiple Acts of Wire Fraud in Violation of 18 U.S.C. § 1343 in Furtherance of the Enterprise

193.  Defendants each conducted the Enterprise's affairs through "a pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(1) and (5). During the ten (10) years preceding the filing of this action and to the present, Defendant did cooperate jointly and severally in the commission of three (3) or more of the predicate acts that are itemized at 18 U.S.C. §§ 1961(1)(A) and (B), in violation of 18 U.S.C. 1962(d), as described in this Complaint. This pattern consists of numerous related acts

of wire fraud (18 U.S.C. § 1343) committed in furtherance of the Monthly Payment Suppression Scheme.

194. The acts set out below ("Racketeering Acts") had the same pattern and purpose to defraud Plaintiffs and the Class for the benefit of Defendant. Each Racketeering Act involved the same or similar methods of commission and participants and affected the Class similarly. Without the repeated predicate acts, the ability to conduct their fraud using the interstate telecommunications wires, the Enterprise's goal of carrying out the Monthly Payment Suppression Scheme would not have succeeded. The separate Racketeering Acts all relate to each other in that they were part of concerted actions by Defendants to use the endorsement and channels of the enterprise to operate their business to fraudulently induce Plaintiffs and the Class to purchase D.R. Horton homes with DHI Mortgage and originated FHA loans at a cost that they would not have agreed to but for the scheme.

195. Defendants voluntarily and intentionally devised and participated in a scheme to defraud Plaintiffs and the Class out of money, in reliance on interstate wires. Defendants committed these acts with the intent to defraud Plaintiff and the Class.

196. In engaging in the Monthly Payment Suppression Scheme, it was reasonably foreseeable that interstate wire communications would be used.

197. Each Defendant could not have furthered their fraud without the ability to use the telecommunications wires to share documents, information, and money with the other Defendant, co-conspirators, Homebuyers, and others.

198.   The acts of wire fraud include, but are not limited to, each of the transmissions designed to induce Plaintiffs and the Class to enter the home sales and financing transactions with Defendants which do not conform with industry practices, borrower expectations, and/or FHA requirements. As the Class, the acts of wire fraud follow the same format set forth in Paragraphs 69–95, and the precise dates, locations, and identities of each of Class Members associated with each act are known to Defendants and are in their exclusive control. The Plaintiffs all experience acts of wire fraud following the same format as the Class, and where readily known to Plaintiffs, the precise details of the various acts of wire fraud are set forth in Paragraphs 116–124 (Mr. Santiago) and 147–156 (the Neronha Plaintiffs).

199.   In addition, the acts of wire fraud include Defendants' receipt of funds from the sale of loans procured via the Monthly Payment Suppression Scheme. With respect to D.R. Horton, that includes funds received from DHI Mortgage shortly after Mr. Santiago's closing in March 2024, and shortly after the Neronha Plaintiffs' closing in January or February 2023, and shortly after the closings of Class Members, the dates of which are in the exclusive control of Defendants. With respect to DHI Mortgage, this includes funds received and retained from the loan proceeds shortly after Mr. Santiago's closing in March 2024, and shortly after the Neronha Plaintiffs' closing in January or February 2023, and shortly after the closings of Class Members, the dates of which are in the exclusive control of Defendants; as well as funds received from the sale each loan's servicing rights and funds received related to the transfer of the loans to Ginnie Mae, including funds received from LoanCare shortly after Mr. Santiago's

closing in March 2024, and funds received from Carrington shortly after the Neronha Plaintiffs' closing in January or February 2023, and funds received from servicers shortly after the closings of Class Members, the identities and dates of which are in the exclusive control of Defendants.

## The Monthly Payment Suppression Scheme Proximately Caused Injuries to Plaintiffs and the Class

200.    Defendants' RICO scheme, including its ongoing pattern of racketeering activity, was reasonably calculated to deceive Plaintiffs and Class members, all of whom are of ordinary prudence and comprehension, through the execution of their complex and illegal scheme to misrepresent the true monthly payments for the home purchases and related loans. The scheme has injured and continues to injure Plaintiffs and the Class.

201.    Plaintiffs and Class Members would not have purchased the homes or entered the loans on the terms presented but for the illegal racketeering scheme operated by Defendants.

202.    Defendants' wrongful conduct has caused injury to Plaintiffs and the Class, remains part of their ongoing business practices, and remains a continuing threat to Plaintiffs, the Class, and the general public.

203.    Plaintiffs and the Class suffered economic harm by reason of the said violation of 18 U.S.C. § 1962(c), including but not limited to purchasing a home that they would not have purchased but for the fraudulent scheme, paying an inflated price for their home, diminished home value, lost opportunity to purchase alternative homes

within their budgets, increased out of pocket monthly expenses in the form of a higher PITI, and other consequences, such as an increased risk of foreclosure and late fees, and otherwise depriving them of the benefit of the bargain. The amounts of these damages will be proven at trial.

204.    By reason of the damages directly sustained by Plaintiffs and the Class from the injuries to their business and/or property, they are entitled to treble damages, equitable relief, as well as reasonable attorney's fees and costs, pursuant to 18 U.S.C. § 1964(c).

## COUNT II

**Florida Deceptive and Unfair Trade Practices Act ("FDUTPA")**
**Fla. Stat. § 501.201, et seq.**
*(On Behalf of Plaintiffs and the Florida Sub-class)*

205.    Plaintiffs re-allege paragraphs 1 through 179 as though fully set forth herein.

206.    Plaintiffs bring this claim against Defendants under Florida's Deceptive and Unfair Trade Practices Act § 501.201, et seq ("FDUTPA").

207.    Plaintiffs and Class Members are "consumers" within the meaning of Florida Statute § 501.203(7).

208.    Defendants were engaged in trade or commerce within the meaning of Fla. Stat. § 501.203(8) throughout the class period.

209.    Florida Statute § 501.204(a) provides: "Unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the

conduct of any trade or commerce are hereby declared unlawful." §501.204, Fla. Stat. (2022).

210.    The Florida Legislature has mandated that FDUTPA be liberally construed. § 501.204, Fla. Stat. (2022).

211.    FDUTPA seeks to protect legitimate consumers, like Plaintiffs and Class Members, from those who engage in unfair methods of competition, or unconscionable, deceptive, and/or unfair acts or practices in the conduct of any trade or commerce.

212.    Defendants violated FDUTPA in three distinct ways, each of which, standing alone, is a violation of FDUTPA: (i) Defendants engaged in per se violations of rules; (ii) Defendants engaged in deceptive acts or practices; and/or (iii) Defendants engaged in unfair acts or practices, committed an unfair, immoral, and unethical practice that is substantially injurious to consumers.

### *Per Se* **FDUTPA Violations**

213.    A defendant *per se* violates FDUTPA in one of two ways: (1) if the law, statute, rule, regulation, or ordinance 'expressly constitutes a violation of FDUTPA' or (2) if the law, statute, rule, regulation, or ordinance 'proscribes unconscionable, deceptive, or unfair acts or practices and therefore operates as an implied FDUTPA predicate.'" *Steven Michael Cox v. Porsche Fin. Services, Inc.*, 16-23409-CIV, 2020 WL 837167 (S.D. Fla. Feb. 19, 2020); *see* § 501.203(c), Florida Statutes.

214.    FHA Mortgagees (i.e., the original lender, and later the Holders and Servicers of the loans) are required to escrow "all" property taxes, as well as insurance

70

and other required payments, and to ensure that these are escrowed appropriately pursuant to RESPA. 24 C.F.R. § 203.23. *See also* FHA Handbook 4000.1 at 361-62, 375.

215.    This provision is intended to ensure that Homebuyers are made aware of the monthly payment associated with the loan, that the loan is affordable, and that borrowers have the ability to repay the loan. The provision thus proscribes the unfair or deceptive acts of suppressing the true cost of the home purchase and loan from borrowers and/or misrepresenting the true costs of the transaction, causing payment shock for Homebuyers.

216.    As described in paragraphs 34–37, Defendants violated the letter and intent of this provision by only failing to escrow all property taxes, and instead only including a small portion of the property taxes in the escrow account and thus artificially suppressing the monthly payment, thereby inducing borrowers into the transactions.

217.    RESPA requires that, at the time of origination, the borrower must be provided "a statement clearly itemizing the estimated taxes . . . that are reasonably anticipated to be paid from the escrow account during the first 12 months after the establishment of the account . . . ." 12 U.S.C. § 2609(c)(1)(A); *see also* 12 C.F.R. § 1024.17.

218.    The Truth in Lending Act ("TILA") requires that the Closing Disclosure must accurately disclose projected payments, including accurately estimated escrow payments. 12 C.F.R. § 1026.38(c).

71

219.    Neither RESPA nor TILA permit the inclusion of a portion, but not all, of the estimated property taxes in the escrow account.

220.    These provisions are intended to ensure that borrowers are made meaningfully aware of all the monthly payment associated with the loan to assist them in making informed decisions about whether to enter the transaction. The provision thus proscribes the unfair or deceptive acts of suppressing the true cost of the home purchase and loan from borrowers and/or misrepresenting the true costs of the transaction, causing payment shock for Homebuyers.

221.    As described in paragraphs 34–37, Defendants violated the letter and intent of these provisions by only including a small portion of the property taxes in the escrow account and thus artificially suppressing the monthly payments, thereby inducing borrowers into the transactions.

222.    By violating FHA, RESPA, and/or TILA, Defendants engaged in a per se violation of FDUTPA.

223.    Defendants knowingly and willingly committed these unfair and/or deceptive acts and practices for their own profit and for the profit of their shareholders.

224.    The unfair and/or deceptive acts or practices took place in this State because Defendants operate in this State and because the underlying home sales were for homes in Florida.

225.    Defendants' unfair and/or deceptive conduct occurred, and continues to occur, in the course of Defendants' business.

226.    Defendants' actions were the direct, foreseeable, and proximate cause of the damages that Plaintiffs and the Florida Sub-class members have sustained.

227.    As a direct and proximate result of Defendants' misconduct and violations of the FDUTPA, Plaintiffs and the Florida Sub-class were injured and suffered actual damages, including but not limited to paying an inflated price for their home, diminished home value, lost opportunity to purchase alternative homes within their budgets, increased out of pocket monthly expenses in the form of a higher monthly payment, to be proven at trial, as a result of Defendants' scheme.

228.    Plaintiffs and the Florida Sub-class members seek actual damages, equitable relief including an injunction to halt Defendants' unlawful practices, and reasonable attorneys' fees from Defendants. Fla. Stat. Ann. § 501.211.

### Unfairness and/or Deception

229.    In addition, or in the alternative to the *per se* violations Defendants' practice of misrepresenting the true monthly payment and failing to escrow the full property taxes is "immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *Cummings v. Warren Henry Motors, Inc.,* 648 So. 2d 1230, 1233 (Fla. 4th DCA 1995) (citing *Spiegel, Inc. v. Fed. Trade Comm.,* 540 F.2d 287, 293 (7th Cir.1976)).

230.    Defendants' aforementioned actions, including those detailed in paragraphs 69–95, led to, and continues to lead to, consumers entering transactions they otherwise would not have if Defendants had not suppressed the true monthly housing cost, including through misleading Loan Estimates and Closing Disclosures.

Plaintiffs would not have purchased the homes had they known that the monthly cost would be more expensive than advertised at closing, or at a minimum, would have paid less.

231.    Defendants' unfair and/or deceptive actions of using misleading Loan Estimates and Closing Disclosures to obscure the full and true price of its homes, and the full monthly cost of the mortgage is likely to deceive consumers into purchasing the homes with DHI mortgages because the estimated monthly cost is material to the average, ordinary, and reasonable consumer. Defendants knew consumers would rely on the estimated payment. By using a partially escrowed property tax calculation in its monthly payment estimate, Defendants have demonstrated that this lower monthly payment is material to consumers. As a result of their deceptive acts and practices, Defendants have sold thousands of homes. If Defendants had performed the escrow calculation truthfully and in a non-misleading fashion, Plaintiffs, and the Florida Sub-class Members, would not have purchased the homes or would not have paid as much.

232.    Defendants' actions in failing to escrow the full property taxes, as described herein, are unfair and/or deceptive acts or practices in the conduct of business trade or commerce. Defendants' actions are unfair and/or deceptive because Defendants conduct led customers into believing their monthly payment or PITI would be significantly lower than it was.

233.    This scheme is unfair because it gives Defendants a disproportionate advantage over other competitors in the industry that do not employ the same illegal practices. Additionally, Defendants have an unfair advantage over Plaintiffs and the

Florida Subclass as well, as they were not fully informed of the details of the transaction at the time they compared the monthly payment or PITI of an existing home with the D.R. Horton home.

234.    Although not required by Florida law, Plaintiffs and the Florida Subclass members reasonably relied on Defendants' material misrepresentations, omissions, and deceptive policies and practices, and would not have purchased the homes from Defendants, or would not have paid as much for said homes, had they known the truth about Defendants' policies and practices. *See Bechor v. Simcenter, Inc.*, 394 So. 3d 666, 669 (Fla. 3rd DCA 2024) ("[U]nlike fraud, a party asserting a deceptive trade practice claim need not show actual reliance on the representation or omission at issue.").

235.    Defendants knowingly and willingly committed these unfair and/or deceptive acts and practices for their own profit and for the profit of their shareholders.

236.    The unfair and/or deceptive acts or practices took place in this State because Defendants operate in this State and because the underlying home sales were for homes in Florida.

237.    Defendants' unfair and/or deceptive conduct occurred, and continues to occur, in the course of Defendants' businesses.

238.    As a direct and proximate result of Defendants' misconduct and violations of the FDUTPA, Plaintiffs and the Florida Sub-class were injured and suffered actual damages, including but not limited to paying an inflated price for their home, diminished home value, lost opportunity to purchase alternative homes within

their budgets, increased out of pocket monthly expenses in the form of a higher monthly payment, to be proven at trial, as a result of Defendants' scheme.

239.   Plaintiffs and the Florida Sub-class members seek actual damages, equitable relief, an injunction to halt Defendants' unlawful practices, and reasonable attorneys' fees from Defendants. Fla. Stat. Ann. § 501.211.

## COUNT III

### Negligence
### *(On behalf of Plaintiffs and the Class)*

240.   Plaintiffs re-allege paragraphs 1 through 179 as though fully set forth herein.

241.   Defendants owed a duty of care to Plaintiffs and Class members in Defendants' marketing and sales of homes; and in Defendants' marketing, sales, and origination of FHA home loans.

242.   Defendants breached this duty by failing to accurately calculate the PITI payment, by failing include all taxes in the escrow analysis; and by thereby failing to disclose an accurate payment to borrowers.

243.   Defendants further breached this duty by choosing to make FHA loans and representing to homebuyers that they were complying with FHA requirements, when in fact they were failing to do so.

244.   Plaintiffs and the class were damaged by this breach, including but not limited to paying an inflated price for their home, diminished home value, lost

opportunity to purchase alternative homes within their budgets, increased out of pocket monthly expenses in the form of a higher monthly payment, to be proven at trial, as a proximate result of Defendants' breach.

245.   Plaintiffs are thus entitled to actual damages and all other appropriate relief.

## COUNT IV

### Unjust Enrichment
### *(On behalf of Plaintiffs and the Class)*

246.   Plaintiffs re-allege paragraphs 1 through 179 as though fully set forth herein.

247.   Defendants unlawfully conducted their Monthly Payment Suppression Scheme with the express intent of profiting from closing more home sales and loans and inflating the profits realized from these sales and loan originations.

248.   Plaintiffs and the Class thus conferred a benefit on Defendants by paying Defendants for the homes and the loans.

249.   Defendants had knowledge of the benefits conferred on them.

250.   Defendants voluntarily accepted and retained these benefits.

251.   The circumstances, as alleged herein, including that Defendants suppressed the true monthly payment from Plaintiffs and the Class and led Plaintiffs to believe that the monthly payments would be substantially lower, leading ultimately to payment shock for Plaintiffs and the Class, make it inequitable for Defendants to

retain the benefits of their scheme.

252.    Plaintiffs thus request that the Court order that Defendants disgorge all amounts by which they were unjustly enriched.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and in favor of the Class, and against Defendants for:

a.    an order certifying this case to proceed as a class action, designating Plaintiffs as the Class representatives, and designating the undersigned attorneys as Class Counsel;

b.    actual damages and interest;

c.    treble damages and interest;

d.    a declaration that Defendants' conduct is unlawful as set forth herein;

e.    injunctive relief requiring Defendants to cease all such unlawful conduct;

f.    equitable relief including but not limited to disgorgement of Defendants' profits;

g.    attorney's fees and costs; and

h.    such further relief as this Court may deem appropriate.

## Jury Demand

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated:          October 1, 2025          Respectfully submitted,

**VARNELL & WARWICK, P.A.**

By:     /s/ Jeffrey L. Newsome, II
        Jeffrey L. Newsome, II: 1018667
        Brian W. Warwick; FBN: 0605573
        Janet R. Varnell; FBN: 0071072
        Christopher J. Brochu: 1013897
        Pamela Levinson, 538345
        400 N. Ashley Dr., Ste. 1900
        Tampa, FL 33602
        Telephone: (352) 753-8600
        Facsimile: (352) 504-3301
        *bwarwick@vandwlaw.com*
        *jvarnell@vandwlaw.com*
        *jnewsome@vandwlaw.com*
        *cbrochu@vandwlaw.com*
        *plevinson@vandwlaw.com*
        *ckoerner@vandwlaw.com*

        **CLARKSON LAW FIRM, P.C.**
        Kristen G. Simplicio (*pro hac vice forthcoming*)
        Roke Iko (*pro hac vice forthcoming*)
        1050 Connecticut Avenue NW, Suite 500
        Washington, DC 20036
        Telephone: (202) 998-2299
        *ksimplicio@clarksonlawfirm.com*
        *riko@clarksonlawfirm.com*

        **NATIONAL CONSUMER LAW CENTER**
        Jennifer Wagner (WVSB # 10639) (*pro hac vice forthcoming*)
        Shennan Kavanagh (MA BBO # 655174) (*pro hac vice forthcoming*)
        7 Winthrop Square, 4th Floor
        Boston, MA 02144
        Telephone: (617) 542-8010

Fax: (617) 542-8028
*jwagner@nclc.org*
*skavanagh@nclc.org*

***Attorneys for Plaintiffs and the Proposed Class***